UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:21-cv-22878

JONATHAN E. PERLMAN, Esq.,
as court-appointed Receiver of
TCA Fund Management Group Corp., *et al.*,

      Plaintiff,

v.

AMERICAN EXPRESS COMPANY,
AMERICAN EXPRESS NATIONAL BANK,
and AMERICAN EXPRESS TRAVEL
RELATED SERVICES CO., INC.,

      Defendant(s).
_____/

**COMPLAINT FOR DAMAGES
AND DEMAND FOR JURY TRIAL**

Plaintiff Jonathan E. Perlman, as the court-appointed Receiver ("Receiver") for (1) TCA Fund Management Group Corp., (2) TCA Global Credit Fund GP, Ltd., (3) TCA Global Credit Fund, LP, (4) TCA Global Credit Fund, Ltd., (5) TCA Global Credit Master Fund, LP, and (6) TCA Global Lending Corp., brings this Complaint for Damages and Demand for Jury Trial against Defendant(s) American Express Company, American Express National Bank, and American Express Travel Related Services Co., Inc. (together, "AMEX" or "Defendant"), and alleges:

**PARTIES, JURISDICTION AND VENUE**

1.    The Receiver was appointed by the United States District Court for the Southern District of Florida ("Enforcement Court") in the case *Securities and Exchange Commission v. TCA Fund Management Group Corp. et al., No. 20-21964-CMA (S.D. Fla.)* ("Enforcement Case").

2.    The Enforcement Court has authorized, empowered and directed the Receiver to

bring actions for the benefit of and on behalf of the Receivership Estate as the Receiver deems necessary and appropriate, including claims to avoid and recover fraudulent transfers.

3. This is an action to recover fraudulent transfers from the Defendant for the benefit of the Receivership Estate in accordance with the directive of the Enforcement Court.

4. This Court has jurisdiction over each of the Defendants under 28 U.S.C. §§754 and 1692 and has subject matter jurisdiction over this matter under 28 U.S.C. §§754, 1367 and 1692. Venue is proper in this Court.

## FACTS COMMON TO ALL COUNTS

**A.   Master Fund's Business and TCA Management's Improper Revenue Recognition Practices as Alleged in the SEC Complaint.**

5. On May 11, 2020, the Securities and Exchange Commission ("SEC") filed its *Complaint for Injunctive and Other Relief* (the "SEC Complaint"), initiating the Enforcement Case against (1) TCA Fund Management Group Corp. ("TCA Management"), and (2) TCA Global Credit Fund GP, Ltd. ("GP"). The SEC sought to enjoin violations of the federal securities law by TCA Management and GP.

6. The SEC named as Relief Defendants in the Enforcement Case (1) TCA Global Credit Fund, LP ("Feeder Fund LP"), (2) TCA Global Credit Fund, Ltd. ("Feeder Fund Ltd." and together with Feeder Fund LP, the "Feeder Funds"), and (3) TCA Global Credit Master Fund, LP ("Master Fund" and with the Feeder Funds, the "Funds"). The SEC named the Funds as Relief Defendants to ensure a proper wind-up of their business and a fair and appropriate distribution to the Feeder Funds' approximately 470 investors.

7. TCA Management, TCA GP, and the Funds collectively are referred to herein and in the Enforcement Case as the "Receivership Entities."

8. Before the Receiver's appointment, the businesses of and relationship among the

Receivership Entities was as follows: The Feeder Funds raised money from investors through private sales of securities. The Feeder Funds invested the funds that they raised in Master Fund, which provided short-term secured financing, and also purported to provide investment banking services, to small- and medium-size businesses. TCA Management was the Funds' investment advisor and received compensation from Master Fund based on the amount of the Funds' assets (the "net asset value" or "NAV"). TCA Management was paid a pro rata monthly "management fee" equal to a range of 1.5% to 2% per year of the Funds' NAV. GP was the general partner of Master Fund and Feeder Fund LP and was compensated based on the amount of Master Fund's profitability. GP was paid a monthly "performance allocation" equal to a range of 20% to 25% of Master Fund's realized and/or unrealized net profits.

9. The SEC Complaint alleged that since 2010 and continuing through at least November 2019, TCA Management engaged in revenue recognition practices that inflated Master Fund's revenue (and therefore profits) and, as a result, and the Funds' NAV, using two methods.

10. According to the SEC Complaint, the first method involved Master Fund's lending business between in or about April 2010 and December 2016. In this method, the prospective borrower and Master Fund would sign a term sheet outlining the terms of a loan, including the amount of fees the borrower would pay Master Fund when the loan transaction was consummated. TCA Management would then cause Master Fund to recognize the prospective loan fees as revenue upon execution of the term sheet (as opposed to loan closing), even though the term sheets were not binding and in many cases did not lead to a funded loan, such that the loan fee was never earned. Recognizing the loan fee revenue at the time of term sheet execution artificially increased Master Fund's profits and the NAV until the loan was funded or written off by TCA Management.

11. The second method that TCA Management employed to inflate Master Fund's

revenue, profits, and NAV according to the SEC Complaint occurred between in or about the latter half of 2016 and November 2019, and involved agreements for Master Fund to provide investment banking services. In connection with financing transactions, borrowers were usually required to sign an "investment banking" or "advisory services" agreement with Master Fund that required the borrower to pay an "investment banking" or "advisory" fee to Master Fund that was "earned upon execution" of the agreement (the "<u>IB Fees</u>"). The IB Fees ranged in amounts from hundreds of thousands to millions of dollars. According to the SEC, TCA Management caused Master Fund to recognize these IB Fees as revenue at the time the agreement was signed even though (a) these companies lacked the financial wherewithal to pay the fees unless Master Fund was successful in obtaining financing for the company, which rarely occurred, and (b) Master Fund had provided few if any services at the time the agreement was signed.

12.     According to the SEC, TCA Management knew that Master Fund was unlikely to be paid the vast majority of the IB Fees.

13.     Indeed, according to the SEC Complaint, many of the companies that sought financing from Master Fund had insufficient cash to meet their working capital needs, and many used the loan proceeds to repay other debts. A substantial portion of the loans extended by Master Fund defaulted and ended up in litigation, as alleged in more detail below.

14.     The SEC Complaint further alleged that TCA knew (or was severely reckless in not knowing) that Master Fund had performed few if any of the services recited in the underlying investment banking agreements at the time they were signed. Many of the companies in question later denied owing any money to Master Fund under the agreements.

15.     The SEC Complaint alleged that the booking of investment banking revenue at the time of agreement execution inflated the NAV by at least $130 million as of November 2019, and

resulted in Master Fund improperly recognizing at least $155 million in cumulative revenue from September 2016 through November 2019.

16. According to the SEC Complaint, TCA Management knowingly distributed to investors monthly account statements falsely representing the amount of their monthly returns and investment balances based on the inflated NAV. Indeed, the Funds never reported a down month. Yet without TCA Management's improperly recording the IB Fees as revenue, the Funds would have had numerous months of negative returns since inception according to the SEC's allegations.

17. As alleged by the SEC, Master Fund's auditor issued a qualified opinion for Master Fund's 2017 and 2018 financial statements that included the following qualifications: (a) for 2017, all of Master Fund's investment banking income of $79.7 million (70% of total income) and assets of approximately $195 million (approximately 44% of Master Fund's NAV of $447.9 million); (b) for 2018, $61.6 million in investment banking income (about 47% of total income) and assets totaling approximately $384 million (about 89% of Master Fund's NAV of $430.8 million). Further, the auditor noted in its opinion on the 2018 financial statements that $53,517,722, or 46% of the loans outstanding, were in litigation, and that the auditor could not confirm the validity of an additional $8,658,952, or 8% of the loans outstanding.

18. The SEC alleged that the Master Fund's cash position deteriorated considerably in the period 2017-2020: while Master Fund historically held 20% to 30% of its assets in cash, beginning in March 2018, its cash position had decreased to less than 10% of its assets, and beginning in May 2019, that amount declined to below 5% of total assets.

19. On January 21, 2020, the Feeder Funds sent letters to their investors advising that the Funds would be winding up their affairs, citing, among other things, that the Funds had received redemption and withdrawal requests in excess of the Funds' available cash, that the Funds

had grown increasingly illiquid, and that Funds' continued operation was not commercially viable.

### B. The Consent Judgment, Order Appointing the Receiver, and the Receiver's Investigation of the Receivership Entities' Financial Affairs.

20. On May 11, 2020, SEC filed its complaint against TCA Management and GP.

21. Also on May 11, 2020, the Enforcement Court entered its Order Granting Plaintiff Securities and Exchange Commission's Unopposed Expedited Motion for Appointment of Receiver ("Receivership Order"). The Enforcement Court found that the appointment of a receiver was necessary and appropriate for purposes of marshaling the Receivership Entities' assets and assets that: (a) are attributable to funds derived from investors or clients of the Receivership Entities; (b) are held in constructive trust for the Receivership Entities; (c) were fraudulently transferred by the Receivership Entities; and/or (d) may otherwise be includable as assets of the estates of the Receivership Entities. The Receivership Order appointed the Receiver for the foregoing purposes, among others, with the authority and powers of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Federal Rule of Civil Procedure 66.

22. On May 12, 2020, the Enforcement Court entered its Judgment of Permanent Injunction and Other Relief against TCA Management and GP. TCA Management, GP, and the other Receivership Entities consented to the judgment without admitting or denying the allegations of the SEC Complaint. The judgment permanently enjoined TCA Management and GP from engaging in conduct that violated the securities laws.

23. In the Receivership Order, the Enforcement Court authorized, empowered and directed the Receiver to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of the Enforcement Court) to bring actions and legal proceedings for the benefit and on behalf of the Receivership Estate, including

actions for the avoidance of fraudulent transfers.

24. After being appointed, the Receiver and his professionals took possession and control of the Receivership Entities' books, records, information technology systems, accounts, other property, and operations; conducted interviews with their officers, directors, and employees; and conducted a forensic accounting of the Receivership Entities' assets and transactions, among numerous other tasks.

25. Based upon his investigation, the Receiver determined that material allegations in the SEC Complaint were true.

26. Based upon his investigation, the Receiver learned the information alleged below, which allegations are made based upon the Receiver's information and belief based upon what he learned in the course of his investigation.

27. Consistent with the allegations in the SEC Complaint, the Receiver determined that the Funds' financial condition as reflected in its public filings failed to reflect the true picture. Indeed, the value of the assets that came into the Receiver's possession was far less than reported in the Funds' NAVs. For example, the last NAV that Master Fund reported before the Receiver's appointment (the November 2019 NAV reported in December 2019) reflected a loan portfolio with principal valued at nearly $178 million; but of that amount, less than $4 million is performing. The same NAV included an SPV portfolio valued at approximately $115.5 million, but the Receiver estimates that the actual value of the SPV portfolio is approximately $73.8 million (this estimate is subject to change as the Receiver's investigation continues and new information develops). The NAV also included over $135 million in IB fees, the vast majority of which were uncollectible and valueless. Thus, while Master fund reported a NAV of approximately $516.1 million against investor claims of approximately $343.9 million, that was based on assets overstated by over $345

million. In other words, Master Fund's liabilities exceeded its assets by hundreds of millions of dollars.

28. Starting no later than 2015, TCA Management was reporting inflated assets under management and gross asset values to investors and prospective investors and to the SEC and using those inflated numbers to calculate inflated compensation that Master Fund then paid to TCA Management and GP. TCA Management and GP collected their fees based on the inflated financial performance numbers despite that the investment portfolio was worth far less than what was being reported to investors and being used to calculate such fees.

29. The Receiver found upon conducting his investigation that Master Fund's loan portfolio was overvalued for a number of reasons, consistent with the SEC's allegations. The loan portfolio consisted of borrowers that were in poor financial condition and desperate for cash, and the collateral pledged to secure Master Fund's loans that had little, if any value. This debt was not written off even when it was obviously worthless so that the debt continued to accrue interest that would never be paid. The interest was then reported as fictitious returns, and the phantom revenue was used to calculate the NAV and, in turn, TCA Management's compensation from Master Fund.

30. Loans were not written off even after Master Fund's security interest securing the loans (which often were secured by equity in the borrower in loan-to-own type arrangements) had been foreclosed and converted to equity.

31. This information concerning Master Fund's loan portfolio is consistent with the realities that the Receiver faced when he took over the Funds' operation, including servicing the debt portfolio. Although the Funds' prospectuses, annual financial audits, and monthly and other reports suggested that one of the Funds' most valuable asset categories should have been performing loans, the Receiver discovered that there were only two performing loans. A handful

of others were paying regularly, but in amounts far less than the monthly amounts due. The remainder of the loan portfolio was entirely non-performing.

32. As of February 2021, twenty-three (23) loans, totaling $85.5 million, had been transferred by the Receiver to attorneys to initiate collection proceedings (this amount is in addition to loans that were already not performing and in collection on the receivership date).

33. The information learned in the Receiver's investigation also corroborates material allegations in the SEC's Complaint concerning the IB Fees.

34. TCA Management caused Master Fund to book approximately $59 million in IB Fees in 2017, but most of these fees were not collected, nor was any viable investment banking plan ever applied to service the underlying investment banking agreements. In fact, none of the Receivership Entities ever employed an investment banker. The underlying agreements were merely pieces of paper with no viable work or services to back them up. Moreover, although the investment banking agreements were entered into as part of loan transactions (i.e., Master Fund agreed to fund a loan and then provide investment banking services to the borrower), millions of dollars in IB Fees recorded in 2017 were associated with transactions that never closed. TCA Management recorded these "orphaned" IB Fees on Master Funds' balance sheet and used them to calculate the NAV even though they would never be collected because the borrower had agreed to pay them in connection with a loan transaction that never closed.

35. The Funds' financial position continued to worsen in 2018. By March 2018, Master Fund's cash had decreased to less than 10% of its assets. Master Fund historically held 20% to 30% of its assets in cash.

36. Master Fund booked approximately $61 million in IB Fees in 2018, but only a fraction of those fees were associated with deals that actually closed and funded loans. The low

level of funding as compared to prior years resulted in part from Master Fund's increasing liquidity constraints. TCA Management caused Master Fund to carry million in orphaned fees on its books even though they related to loan deals that never funded.

37. Upon information and belief, of approximately 58 transactions involving IB Fees that Master Fund entered into in 2018, only two deals were internally categorized as "good." The vast majority of deals (over 60%) were internally categorized as "bad," meaning that they needed to be written off. But they were not written off. Instead they appeared on Master Fund's books and were reported as revenue.

38. The Funds' financial position continued to worsen in 2019. By May 2019, Master Fund had only 5% of its assets in cash, while historically holding 20-30% of its assets in cash. The balance of Master Fund's assets consisted mostly of amounts owed on loans to thinly capitalized borrowers, a substantial amount of which were in default.

39. Master Fund booked approximately $39 million in IB Fees in 2019, but only a fraction of that amount related to deals that actually closed and funded. The very low level of funding as compared to prior years resulted in part from Master Fund's severe liquidity constraints. Millions of dollars in orphaned fees appeared on Master Fund's books even though they related to loan deals that never funded.

40. Upon information and belief, of the approximately 68 transactions involving IB Fees that Master Fund entered into in 2019, only 14 deals were internally categorized as "good." Thirty-one of the 68 deals, amounting to over $19.7 million of the $39 million booked (over 50%), were internally categorized as "bad," meaning that they needed to be written off. But they were not written off. Instead they appeared on the books of Master Fund and were reported as revenue.

41. Upon information and a belief, as of January 2020, it appears that Master Fund only

10

collected a fraction of $39 Million in IB deals booked in 2019.

42. By November 2019, the NAV was inflated by at least $130 million due to IB Fees that TCA Management and GP knew Master Fund would not collect per the SEC Complaint.

43. No later than December 2019, the Funds' financial position had deteriorated to the point that new investor subscriptions were being used to pay redemptions. In other words, money from new investors was being used directly to pay for distributions to prior investors without any intervening investing occurring. Upon information and belief, a substantial part of the $100 million in redemptions paid in 2019 had its source in new investor subscriptions.

44. In the period 2017 through 2019, approximately 40% of the Funds' approximately $500 million in assets under management consisted of IB Fees arising from investment banking agreements that would never be paid because the underlying loan transactions never closed. Even when loans did close, compensable investment banking work rarely was performed. As alleged above, the Receivership Entities never employed an investment banker.

45. Moreover, the Funds' other assets consisted of loans to borrowers that were not creditworthy and were thinly capitalized, very few of which actually performed under the loan agreements. Upon information and belief, Master Funds' underperforming loan portfolio combined with the fraudulent IB Fees meant that 65-75% of all assets under management were non-performing in the 2017 to December 2019 timeframe.

**C.  TCA Management Uses Unearned Management Fees to Pay Money to or for the Benefit of TCA Management's Insiders.**

46. The motivation for the revenue recognition practices alleged above is the subject of dispute, as is the identity of the individuals responsible for the practices. TCA Management's three Board members, including its two outside directors, maintain that they had no knowledge of improprieties regarding the IB Fees; maintain that the practices were carried out by certain rogue

11

actors not located in TCA Management's main, South Florida-based office; and maintain that the Board members relied upon Master Fund's auditors to bring any improprieties to the Board's attention, which never occurred.

47. Nonetheless, TCA Management's sole business was to operate as the investment advisor and portfolio manager for the Funds, and its source of income was the monthly management fee received from Master Fund calculated based upon the inflated NAV. TCA Management's improper practices with respect to the loan portfolio inflated Master Fund's financial performance so that, *inter alia*, TCA Management and GP collected fees from Master Fund that were highly inflated, or not earned at all.

48. Master Fund has claims against TCA Management and GP for the return of the management fees and performance allocations that TCA Management caused Master Fund to pay to those entities based upon the inflated NAV and other financial performance numbers.

49. Without the highly inflated management fees calculated based on the inflated NAV, TCA Management could not possibly have hoped to pay its extensive operating expenses and obligations in the period 2017 through 2019. In that timeframe, these included, for example, over $14.7 million to payroll processors, and human resources consultants and similar operating costs for employees; over $1,684,000 in rent obligations; over $570,000 in information technology vendor costs; and millions of dollars paid to dozens of professionals to administer the Funds' loan portfolio (e.g., lawyers, accountants, appraisers, turn around consultants, operations experts).

50. TCA Management knew or should have known that the vast majority, if not all of its income was based on the inflated NAV, and knew or should have known that it could not possibly hope to pay its operating expenses and obligations based on the management fees that it was legitimately entitled to receive, if any, in the time period from mid-2016 through 2019. Despite

this, in that same timeframe, TCA Management made substantial transfers to or for the benefit of its insiders.

51. Specifically, during the times material to this action through the commencement of the Enforcement Case, Knightsbridge Capital, which is not a Receivership Entity, had an AMEX account ending in the numbers 93009, which included cards of authorized users of Knightsbridge Capital's AMEX account.

52. Upon information and believe, Knightsbridge Capital is or was an entity owned by a former TCA insider, Robert Press. During the times material to this action, the authorized users of the Knightsbridge Capital AMEX account were Mr. Press, his spouse, and his former spouse.

53. According to TCA Management's books and records, from mid-2016 through the commencement of the Enforcement Case, the charges identified on the schedule attached as **Exhibit 1** to this complaint were made to the Knightsbridge Capital AMEX account for the benefit of the authorized users on that account, and not for the benefit of any Receivership Entity (the "**Insider Charges**").

54. From mid-2016 through the commencement of the Enforcement Case, TCA Management made the transfers identified on the schedule attached as **Exhibit 2** to this complaint to AMEX in payment of, *inter alia*, the Insider Charges (the "**Transfers**").

55. Under the Receivership Order, "the Receiver is authorized, empowered and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after obtaining leave of this Court) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate," including for "avoidance of fraudulent transfers." Receivership Order ¶ 37. The Receiver has obtained leave of Court to bring this action.

56. On February 3, 2021, as part of his investigation pursuant to the Receivership Order regarding the Transfers, the Receiver issued to AMEX a Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises in a Civil Action under FED. R. CIV. P. 45 (the "**Subpoena**").

57. On April 30, 2021, the Receiver filed a Motion to Compel Production of Documents in the Enforcement Case because AMEX did not respond to the Subpoena within its requested, extended deadline to do so, and because AMEX did not respond to the Receiver's attempt to meet and confer to resolve the Subpoena without motion practice.

58. On May 6, 2021, after the Enforcement Court ordered AMEX to produce the responsive documents and awarded contempt sanctions in favor of the Receiver and against AMEX for failing to do so sooner, AMEX produced account statements and documents related to the Insider Charges and Transfers.

59. The Receivership Order enjoins the continuation or commencement of any civil legal proceedings involving the Receiver in his capacity as Receiver, any Receivership Property, or any of the Receivership Entities, until further order of the Enforcement Court; and "as to a cause of action accrued or accruing in favor of one or more of the Receivership Entities against a third person or party, any applicable statute of limitations is tolled during the period in which" the foregoing injunction is in effect. Receivership Order ¶¶ 26-27.

60. All conditions precedent to the filing of this action have been performed, waived, or otherwise excused.

**COUNT I**
**Avoidance and Recovery of Fraudulent Transfers**
**Pursuant to Section 726.105(1)(a), Florida Statutes**

61. The Receiver re-alleges paragraphs 1 through 60 as if fully set forth herein.

62. This is an action under section 726.105(1)(a), Florida Statutes, to avoid and recover the Transfers as fraudulent transfers.

63. TCA Management made the transfers with actual intent to hinder or delay creditors of TCA Management, including without limitation the Funds.

64. At the time of the Transfers, TCA Management was exhibiting badges of fraud including but not limited to the following: (1) the Transfers were made for the benefit of an insider; (2) the Transfers were not disclosed to creditors or investors; (3) before the Transfers were made, TCA Management knew or should have known that it would be threatened with suit or regulatory action if and when the improper revenue recognition practices came to light; (4) the value of the consideration received by TCA Management in exchange for the Transfers was unreasonably small, and in fact TCA Management received no value for the Transfers; and (5) the Transfers occurred during the ongoing revenue recognition scheme, which TCA Management knew or should have known would result in its owing a substantial debt to the Funds on account of their entitlement to repayment of the improperly calculated management fees paid to TCA Management.

**WHEREFORE**, the Receiver demands judgment against Defendant: (i) avoiding the Transfers to Defendant and recovering the amount of those transfers from Defendant; (ii) pre-judgment and post-judgment interest as allowed by law; and (iii) such other and further legal and equitable relief as the Court deems just and proper.

### COUNT II
### Avoidance and Recovery of Fraudulent Transfers
### Pursuant to Section 726.105(1)(b), Florida Statutes

65. The Receiver re-alleges paragraphs 1 through 60 as if fully set forth herein.

66. This is an action under section 726.105(1)(b), Florida Statutes, to avoid and recover the Transfers as fraudulent transfers.

67. TCA Management made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers, and TCA Management:

   a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of TCA Management were unreasonably small in relation to the business or transaction; or

   b. Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

**WHEREFORE**, the Receiver demands judgment against Defendant: (i) avoiding the Transfers to Defendant and recovering the amount of those transfers from Defendant; (ii) pre-judgment and post-judgment interest as allowed by law; and (iii) such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Receiver demands a trial by jury as to all facts, issues, and claims that are so triable.

DATED: AUGUST 6, 2021

GENOVESE JOBLOVE & BATTISTA, P.A.
*Attorneys for Jonathan E. Perlman, Receiver*
100 N. Tampa Street, Suite 2600
Tampa, Florida 33602
Telephone: (813) 439.3100
Telecopier: (813) 439.3110

By: */s/ Michael A. Friedman*
    Michael A. Friedman, Esq.
    Fla. Bar No. 71828
    Email: mfriedman@gjb.law
    Eric D. Jacobs, Esq.
    Fla. Bar No. 85992
    Email: ejacobs@gjb.law
    Irina R. Sadovnic, Esq.
    Fla. Bar No. 124502
    Email: isadovnic@gjb.law